IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

TWANNA D. CRAYTON,     )
     )
     Plaintiff,     )
     )
v.     )     CASE NO. 3:09-CV-726-WC
     )
VALUED SERVICES OF ALABAMA, )
LLC, d/b/a FIRST AMERICAN CASH )
ADVANCE,     )
     )
     Defendant.     )

**MEMORANDUM OPINION AND ORDER**

Currently pending before the Court is Defendant's Motion for Summary Judgment (Doc. #33), Plaintiff's Response (Doc. #34), and Defendant's Reply (Doc. #35). For the reasons that follow, Defendant's Motion for Summary Judgment (Doc. #33) is GRANTED.

**I.    BACKGROUND**

Plaintiff's First Amended Complaint (Doc. #26) is presently pending before the Court. Plaintiff Twanna Crayton ("Plaintiff" or "Crayton") brings several causes of action against her former employer, Defendant Valued Services of Alabama ("Defendant" or "Valued Services"). Specifically, Plaintiff states the following causes of action: 1) that Defendant "violated [Plaintiff's] rights under Title VII [of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*] by treating her less favorably than her Caucasian counterparts in terms of pay and benefits" (Count One); 2) that Defendant violated Plaintiff's rights under Title VII "by subjecting her to harsher work conditions and reprimands because she had engaged in

protected activity by complaining about racially discriminatory conduct against herself and others" and "by terminating her employment because she engaged in protected activity by complaining about racially discriminatory conduct against herself and others" (Count Two); (3) that the alleged discriminatory and retaliatory actions alleged in counts one and two also violated Plaintiff's rights under 42 U.S.C. § 1981 (Count Three); 4) that Defendant "willfully violated the provisions" of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* "by failing to compensate [Plaintiff] with overtime pay for work weeks in which she worked more than forty hours" and by "fail[ing] to maintain accurate records as required by the FLSA with respect to [Plaintiff], including records sufficient to accurately determine [Plaintiff's] wages and hours of employment" (Count Four) and 5) "Defendant retaliated against [Plaintiff] . . . by terminating her, in part, as a result of her complaints regarding her lack of overtime compensation" (Count Five).   First Amended Complaint (Doc. #26) at ¶¶ 32, 35-36, 39, 43-44, & 48.

On May 21, 2010, Defendant filed the instant Motion and supporting materials. Defendant asserts it is entitled to summary judgment for the following reasons:  1) Defendant properly classified Plaintiff as an exempt employee under the FLSA; 2) Plaintiff can not establish a *prima facie* case of retaliation under the FLSA; 3) even assuming such a *prima facie* case, Plaintiff can not establish that Defendant's reason for terminating her employment was pretextual; 4) Plaintiff can not establish a *prima facie* case of discrimination in violation of Title VII with respect to her compensation relative to other employees; even assuming

such a *prima facie* claim, Plaintiff can not show that Defendant's reasons for compensating Plaintiff's supposed comparator differently are pretextual; and 5) Plaintiff's retaliation claims under Title VII and § 1981 fail because Plaintiff's internal complaints did not constitute protected activity, she can not establish a *prima facie* case of retaliation based on alleged disparate discipline and/or surveillance or termination, and she can not show that Defendant's reasons for implementing any employment action, be it termination or non-termination, were pretextual.  Plaintiff filed her "Memorandum Brief Filed in Opposition to Defendant's Motion for Summary Judgment" (Doc. #34) on June 11, 2010, and Defendant filed its Reply (Doc. #35) on June 18, 2010.

## II.   STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Only disputes about material facts will preclude the granting of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.  An issue is 'material' if it might affect the outcome of the case under the governing law."  *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id*. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the nonmovant.  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).  Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Anderson*, 477 U.S. at 255. After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving

4

party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

## III.   STATEMENT OF FACTS

The Court has carefully considered the pleadings in this case and all documents submitted in support of the pleadings before the Court.  The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following relevant facts:[1]

Plaintiff is an African-American female.  Defendant is a deferred presentment services provider[2] operating in numerous states, including Alabama, and was Plaintiff's employer at all times relevant to this action.[3]  In pertinent part, Defendant conducts its operations as follows: Defendant operates its business and transacts loans through separate branches, or stores, throughout Alabama.  Each store is staffed with a Store Manager and one or more hourly sales associates or customer service representatives.  A District Manager (DSM) oversees multiple stores within a given territory.  The DSMs report to a Regional Director of Operations (RDO), who typically oversees four to eight DSMs across multiple states.  The

---

[1]     In making the factual findings set forth herein, the Court relies upon the parties' statements of uncontested facts in each of their briefs, as well as the Court's own findings based on the evidentiary materials submitted to the Court.  The following recitation of facts is not exhaustive; the Court may set forth additional factual findings in discussing and clarifying the legal issues in other portions of this opinion.

[2]     "Deferred presentment services" appears to be industry parlance for "payday loans."

[3]     Defendant is an equal opportunity employer and maintains policies against discrimination, harassment, and retaliation.

5

RDOs report to the Vice President of Operations (VPO), Drew Haney.  The VPO reports to the President, Bob Manning, who is the highest ranking officer in Defendant's corporate structure.

Plaintiff applied for a Store Manager position with Defendant in August of 2006. Plaintiff was hired to manage the Phenix City, Alabama, store and began her employment on or around August 28, 2006.  At that time, her DSM was Clint Gordy and her RDO was Greg Jowers.[4]  At the time she was hired, Plaintiff was classified as an exempt employee for purposes of the FLSA, meaning she would not be paid additionally for overtime worked, and her salary was listed as $27,000.00 per year.  As a Store Manager, Plaintiff's duties included certain managerial and supervisory duties in addition to the sales duties of her subordinate associates.  For example, a Sales Manager: "Coordinates allocation and use of company resources to ensure efficient stable sales growth and collections;" "Works with Corporate Marketing Group to develop and execute local marketing plans and strategies including marketing schedules, coverage maps, and customer appreciation programs;" "Coordinates personnel activities of staff (i.e., personnel scheduling, trains, appraises, rewards, motivates, disciplines, and recommends terminations as appropriate);" "Recommends candidates for interview and selection;" "Prepares store reports and documents in accordance with established company policies and procedures;" "Maintains sales and operating records, and

---

[4]     Apparently, Defendant changed DSMs between Plaintiff's hiring and the date she began working, as Plaintiff interviewed with and was offered her position by DSM Karen Nickles.

files in accordance with established company policies and procedures including Federal and State regulatory compliance." *Job Description*, Ex. 5 to Pl.'s Resp. (Doc. #34).

Sometime after her hiring, Plaintiff was designated a Certified Trainer by Defendant. For each employee she trained, Plaintiff was eligible to receive a performance bonus in addition to her salary.  In June, 2007, Plaintiff discovered that a Caucasian male Store Manager whom she had trained, Casey Benson, was being paid on an hourly basis, rather than a yearly salary, meaning he was eligible to receive overtime.  Plaintiff raised this perceived discrepancy with her then DSM and RDO and admits that she was told that it was attributable, at least in part, to the number of employees assigned to her store relative to that of Mr. Benson. *Deposition of Plaintiff* at 160, Ex. 3 to Plaintiff's Resp. (Doc. #34).[5]  Later, in or around November of 2007, Jack Steffen and Joe Paris replaced Gordy and Jowers as Plaintiff's respective DSM and RDO.

In December, 2007, Plaintiff was engaged in training a Caucasian woman, Pamela Flores, and an African-American woman, Rashada Brown, at her store.  Flores was hired as a Store Manager while Brown was to be a sales associate.  Both women were struggling with passing certain testing required by Defendant as a component of their training.  Plaintiff perceived Steffen's reaction to each woman's struggles with passing the test as disparate.

---

[5]     In pertinent part, Defendant based its FLSA exemption classification for Store Managers upon whether or not the relevant store employed more than one associate in addition to the Store Manager.  For larger stores, i.e., stores employing a Manager and two or more associates, the Store Manager was classified as exempt.  *See Job Description for Sales Manager II*, Ex. 5 to Pl.'s Resp. (Doc. #34) at 2 ("Customarily and regularly supervises two or more full-time equivalent Sales Associates.").

*Memo from Crayton to Cook*, Ex. 5 to Pl.'s Resp. (Doc. #34). On December 21, 2007, Flores took and passed the exam on her third try, outside the presence of Plaintiff. Plaintiff and Flores later argued over whether Flores was required to wait for Plaintiff before taking the test. As the argument escalated, Plaintiff instructed Flores to leave the Phenix City store and wait to hear from Steffen on the matter. Plaintiff and Flores both had phone conversations with Steffen after the argument. Steffen instructed Flores to go work at the Eufala, Alabama, store for the remainder of the day. Plaintiff was not pleased with this because she perceived Flores's conduct as disrespectful and she felt Steffen was condoning such behavior and/or siding with Flores. Later that day, Plaintiff prepared a memo describing the day's events and her belief that Steffen "has shown to [sic] types of treatment when dealing with" Flores and Brown during their training. She faxed the memo to Diane Cook, Defendant's Director of Human Resources.

On December 23, 2007, Plaintiff filed a charge of discrimination with the EEOC. The charge was primarily based upon Plaintiff's continuing concern about her categorization as a salaried employee exempt from overtime relative to other, Caucasian, Store Managers and her belief that she was unfairly compensated due to her race. Plaintiff further claimed that, due to her complaints to Gordy and Jowers about the situation, she had been subject to "unwarranted store and desk audits" and a "racially hostile environment." Thus, Plaintiff alleged retaliation in addition to race discrimination. *Charge of Discrimination*, Ex. 14 to Pl.'s Resp. (Doc. #34). Notice of the charge was provided to Defendant in January, 2008.

8

On January 25, 2008, Defendant reclassified Plaintiff as non-exempt for purposes of the FLSA when one of Defendant's employees left Plaintiff's store and Defendant decided not to immediately replace the employee. The change in status required that, henceforth, Plaintiff would be compensated fully for any overtime worked. Despite the fact that Plaintiff had complained to Defendant and the EEOC about her exempt classification, Plaintiff viewed this change in status as a demotion. *Deposition of Plaintiff*, Ex. 3 to Pl.'s Resp. (Doc. #34) at 115-16.

In March of 2008, Defendant realigned certain of its stores with its auditors. Defendant's auditors operate largely independent of Defendant's DSMs and RDOs. That is, the auditing department generally sets its own schedule for conducting audits, without input from management at the store, district, or regional level. In March, 2008, auditor Dora Clark, an African-American female, assumed responsibility over several stores in Alabama, including Plaintiff's store in Phenix City. Because Clark was new to those stores, her supervisor instructed her to immediately audit the new stores, rather than abiding by the usual schedule for auditing stores. Clark states that this was consistent with the auditing department's customary practice. Clark conducted the audit of Plaintiff's store on March 26-27, 2008, approximately fifty-seven days after the last audit of Plaintiff's store.[6] Plaintiff was unaware the audit was planned and, according to Clark, was combative and defensive toward Clark during the process. Plaintiff's store failed the audit. In response to the failed

---

[6]     Because of Plaintiff's score on her January 29, 2008, audit, Defendant's customary policy indicated that her next audit would come ninety days later.

audit, Plaintiff sent a very large fax or email to the President of the company and Vice-President of Operations in which she challenged various findings of the audit and raised other concerns about the process. Defendant investigated her concerns, but ultimately determined that, while two of her contentions were meritorious, the appropriate revision of the score still resulted in a failed audit for the store.

On April 25, 2008, Plaintiff and Steffen had an email exchange regarding Plaintiff's decision to waive certain fees for two of her customers. Plaintiff first described the situation and why she felt that the fees should be refunded to the customers in an email around 11:45 a.m. *Email from Crayton to Steffen*, Ex. 40 to Pl.'s Resp. (Doc. #34). After investigating the matter, Steffen responded to Plaintiff's email around 1:36 p.m. and instructed her not to refund the fees. *Email from Steffen to Crayton*, Ex. 41 to Pl.'s Resp. (Doc. #34). In an email later that day, Plaintiff indicated that she had already refunded the fees because she did not know that Steffen had responded to her email and further defended her decision to do so. *Email from Crayton to Steffen*, Ex. 42 to Pl.'s Resp. (Doc. #34). Plaintiff faxed and/or emailed VPO Haney and Diane Cook in Human Resources with her concerns about the situation and her disagreement with Steffen over the refunds.

In conjunction with Defendant's review of Plaintiff's audit-related complaints, and in response to other concerns with Plaintiff's performance and interactions, Defendant decided to issue some Performance Counseling Reviews (PCR), or written warnings, to Plaintiff. Accordingly, on May 2, 2008, Plaintiff was presented with three PCRs that had

been prepared by Cook after collaborating with Paris.  The first PCR concerned Plaintiff's

practice of raising concerns about operational matters outside her direct chain of command,

which was deemed a violation of Defendant's policy for resolving differences and

misunderstandings as set forth in the Operations Associate Handbook.[7]  The PCR identified

three discrete instances in which it was determined that Plaintiff's conduct violated

Defendant's policy: 1) Plaintiff's December 21, 2007, fax or email to Cook regarding

Steffen's handling of the Flores situation; 2) Plaintiff's March 28, 2008, fax or email to

President Manning and VPO Haney about the failed audit; and 3) Plaintiff's April 25, 2008,

fax or email to Cook and VPO Haney about her dispute with Steffen over her refund of fees

to two customers.  The PCR further instructed Plaintiff on how to raise operational concerns

which involve her DSM, Steffen.  Plaintiff was advised that she was required under the

policy to contact her RDO, Paris, if she is "unsatisfied" with Steffen.

    The second PCR given Plaintiff concerned her failed audit.  The PCR attributed the

failure to Plaintiff's "lack of knowledge, refusal to follow processes, policy & procedure

outlined in e-manual."  The PCR further instructed Plaintiff to read the e-manual and pass

all subsequent audits.

    The final PCR concerned Plaintiff's refund of fees to two customers despite Steffen's

---

[7]    Specifically, the policy instructs that employees are to raise issues, not including harassment, with their "immediate supervisor."  If the employee is not comfortable in doing so with their "immediate supervisor," or if the problem is not satisfactorily resolved after a complaint is made to such supervisor, then the employee is instructed to "meet with the next management level," and so on until the problem is resolved.  *See Resolving Differences and Misunderstandings*, Ex. 37 to Pl.'s Resp. (Doc. #34).

instruction not to refund the fees.   The PCR stated that Plaintiff "ignored her manager's decision not to waive fees and had waived fees prior to permission from her manager" and further instructed Plaintiff to obtain "written approval from her DSM, Jack Steffen, before waiving fees for a customer."

In addition to the three PCRs, Paris also prepared a memorandum for Plaintiff which he intended as a "summary" of the PCRs and as notice of other concerns held by Defendant regarding Plaintiff's performance and demeanor.  The memorandum explained, at length, the problems caused by Plaintiff's repeated practice of complaining about operational matters outside her chain of command.  The memorandum also raised Defendant's concern about the high turnover rate of employees at Plaintiff's store and highlighted certain areas where Plaintiff's performance was deemed insufficient in implementing certain of Defendant's sales, marketing, and charitable initiatives.   In light of these various concerns, Paris determined to suspend Plaintiff's training certification, with the possibility of reinstatement upon her demonstration of improvement.  Paris further advised Plaintiff that her failure to address and correct the problems outlined in the memorandum would subject her to "further disciplinary action up to and including termination." *Memorandum from Paris to Crayton*, Ex. 7 to Pl.'s Resp. (Doc. #34).

On May 2, 2008, Diane Cook sent a letter to Plaintiff conveying the results of Defendant's review of Plaintiff's complaint about the audit and counseling Plaintiff about circumventing the chain of command when lodging complaints about operational matters and

Defendant's concerns about Plaintiff's strained interactions with others.  The letter informed that Plaintiff would no longer be allowed to train new hires and further warned Plaintiff that "[i]mmediate improvement [with respect to both "interpersonal relationships" and job performance] is necessary or your employment will be terminated."  *Letter from Cook to Crayton*, Ex. 26 to Pl.'s Resp. (Doc. #34).

On May 6, 2008, a Sales Associate at Plaintiff's store, Niquitta Williams, an African American female, phoned Steffen and complained about Plaintiff's recent behavior toward her.  She requested a transfer out of Plaintiff's store in lieu of resignation.  Steffen relayed the matter to Paris, who instructed him to discuss it with Cook.  Eventually, Steffen recommended that Plaintiff be terminated based upon the continuing pattern of Plaintiff's behavior.  In considering whether to terminate Plaintiff, Paris considered both the record of her interactions with different employees and the overall performance of her store during her tenure.  Paris determined that both concerns militated in favor of terminating Plaintiff's employment.  Accordingly, Plaintiff was terminated on May 16, 2008.

On April 13, 2009, the EEOC issued a Determination in which it concluded that "[t]estimonial and documentary evidence disclosed that Charging Party was singled out for criticism and discharged from her position in retaliation for opposing a protected activity." *EEOC Determination*, Ex. 51 to Pl.'s Resp. (Doc. #34) at 1.[8]

---

[8]      Somewhat confusingly, the Determination states that the evidence reviewed by the EEOC "established reasonable cause to believe that Charging Party was discriminated against because of her race," despite apparently reaching a contrary conclusion in the very next paragraph when it states "the evidence obtained in the investigation established no reasonable

## IV.   DISCUSSION

Defendant has moved for summary judgment on each of Plaintiff's claims.  The Court will address each claim below.

### A.   Discrimination in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

In Counts One and Three of the First Amended Complaint, Plaintiff claims that she was treated "less favorably than her Caucasian counterparts in terms of pay and benefits[,]" in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*., and 42 U.S.C. § 1981.  First Amended Complaint (Doc. #26) at ¶¶ 32, 39.  The factual allegations which appear to support Plaintiff's discrimination claims consist of her charge that, "[s]imilarly situated Caucasian employees were classified as hourly employees making them eligible to receive overtime pay[;]" and Defendant "continued to hire Caucasian managers under more favorable terms than" Plaintiff.  *Id.* at ¶¶ 15, 19.  Defendant contends that Plaintiff has failed to state a *prima facie* claim of discrimination based on compensation because her claim generally lacks evidentiary support and because she has failed to identify any similarly situated individuals that received more favorable treatment by Defendant.  In particular, Defendant contends that Plaintiff and the supposed comparator she identifies, Casey Benson, are not similarly situated because, unlike Plaintiff, Benson had several years of relevant experience at the time of his hiring and had a college degree.  Def.'s Memo (Doc.

---

cause to believe that Charging Party was discriminated against because of her race[.]" *EEOC Determination*, Ex. 51 to Pl.'s Resp. (Doc. #34) at 1-2.

14

#33-1) at 24-25.

Title VII "makes it unlawful for an employer to 'discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race." *Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (quoting 42 U.S.C. § 2000e-2(a)(1)).[9]  "A prima facie claim of discrimination can be established three ways: 1) direct evidence; 2) circumstantial evidence; or 3) statistical proof." *Davis v. City of Panama City, Fla.*, 510 F. Supp. 2d 671, 681 (N.D. Fla. 2007) (citing *Earley v. Champion Int'l Corp.*, 907 F. 2d 1077, 1081 (11th Cir.1990)).  Plaintiff has offered no direct evidence of racial discrimination by Defendant.  Rather, Plaintiff's First Amended Complaint appears to rely upon only circumstantial evidence in support of her claim of discrimination.  Accordingly, the Court must utilize the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.[10]

---

[9]      While Plaintiff also presents a claim under § 1981, "the analysis under [that] claim mirrors that under Title VII." *Brown*, 597 F.3d at 1174 n.6; *see also Standard v. A.B.E.L. Serv., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both of these statutes [Title VII and § 1981] have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.").

[10]      *See Standard*, 161 F.3d at 1332 ("When a plaintiff offers circumstantial evidence to prove a Title VII claim, we use the analytical framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [] (1973). Under this framework, the plaintiff must establish a prima facie case of discrimination. The establishment of a prima facie case creates a presumption of discrimination. The employer must then offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption. If the employer successfully rebuts the presumption, the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual.").

15

Under the *McDonnell Douglas* framework, to establish a *prima facie* case of discrimination under Title VII the plaintiff must show: "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006).  Regarding the third prong of the inquiry,  "[t]he plaintiff and the employee she identifies as a comparator must be similarly situated in all relevant respects.  The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (internal quotation omitted).

Plaintiff now concedes that, "[i]n light of the evidence developed during the discovery process, . . . she cannot establish the third prong of her *prima facie* case in light of Benson's education and experience [and that] . . . summary judgment is due to be granted on that claim." Pl.'s Resp. (Doc. #34) at 36-37 (citation omitted).  Accordingly, summary judgment shall be granted in favor of Defendant on Plaintiff's Title VII and § 1981 discrimination claims.

**B.      Retaliation in violation of Title VII and § 1981.**

In Counts Two and Three of her First Amended Complaint, Plaintiff claims that she was unlawfully retaliated against in violation of Title VII and § 1981 when Defendant allegedly "subject[ed] her to harsher work conditions and reprimands" and eventually

"terminat[ed] her employment because she had engaged in protected activity by complaining about racially discriminatory conduct against herself and others."  First Amended Complaint (Doc. #26) at ¶¶ 35-36, 39.  Plaintiff describes Defendant's non-termination retaliatory conduct as follows: 1) failing to timely respond, or not responding altogether, to Plaintiff's "requests for assistance regarding matters requiring immediate attention at her location;" "increased surveillance of [Plaintiff] at her store;" failing "to timely conduct [Plaintiff's] performance review thereby delaying deserved pay increase;" demoting Plaintiff "by removing her designation as a Certified Training Manager;" carrying out "repeated and unwarranted audits" of Plaintiff's store; forcing Plaintiff "to work every weekend until further notice;" ordering Plaintiff "to provide the District Manager with a weekly roster of her schedule;" "issuing multiple, undeserved and unwarranted reprimands to" Plaintiff; and "repeatedly threaten[ing] to terminate" Plaintiff's employment. *Id.* at ¶ 25.  Plaintiff further claims that the May 2, 2008, PCRs were based on "stale and questionable incidents," and that her eventual termination was also an incident of retaliation. *Id.* at ¶¶ 26, 28.

Defendant contends that it is entitled to summary judgment on any theory of retaliation asserted by Plaintiff because her internal complaints about alleged disparate treatment of herself or others did not amount to a protected activity, her allegations concerning discipline or "increased surveillance" do not suffice as materially adverse employment actions, and she cannot show that any of Defendant's justifications for its actions are pretext.  Defendant further claims that, as to Plaintiff's retaliatory discharge

17

claim, Plaintiff has failed to show a *prima facie* case of retaliation and, moreover, Plaintiff is unable to show that Defendant's proffered reasons for terminating Plaintiff are pretext. Def.'s Memorandum (Doc. #33-1) at 26-36.  Finally, Defendant also asserts that, in failing to address Defendant's arguments with respect to Defendant's alleged non-termination conduct, Plaintiff has essentially abandoned her claims that Defendant's non-termination conduct was unlawfully retaliatory.  Def.'s Reply (Doc. #35) at 2-3.

### 1.    Plaintiff's non-termination retaliation claims.

The Court will first address Defendant's claim that Plaintiff has abandoned all of her retaliation claims excepting retaliatory discharge.  As discussed above, Plaintiff's First Amended Complaint presents several allegations of retaliatory conduct less than termination. Defendant addressed those claims, contending that 1) Plaintiff's complaint in the December 21, 2007, memorandum to Cook about Steffen's alleged disparate treatment of Brown and Flores does not constitute protected activity, 2) that Plaintiff cannot establish a causal link between Defendant's non-termination conduct and Plaintiff's filing of a charge of discrimination, 3) that Defendant's actions complained of by Plaintiff do not constitute materially adverse employment actions, and 4) Plaintiff cannot establish that Defendant's justification for any actions taken are pretextual.  In responding to Defendant's motion for summary judgment as to Plaintiff's retaliation claims, Plaintiff wholly failed to address Defendant's arguments respecting Defendant's alleged non-termination retaliatory conduct. *See* Pl.'s Response (Doc. #34) at 37-42.  Instead, Plaintiff limited her discussion of retaliation

18

to her claim of retaliatory discharge. *See, e.g., id.* at 37 ("Further, there can be no dispute that Crayton suffered an adverse employment action when she was terminated."). Thus, Defendant contends, all such claims have been abandoned.

The Court agrees with Defendant. Plaintiff's failure to address Defendant's many arguments with respect to perceived infirmities with her non-termination retaliation claims amounts to an abandonment of such claims. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned, and affirming grant of summary judgment, as to claim presented in complaint but not raised in initial response to motion for summary judgment); *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1325 (11th Cir. 2000) (finding claim abandoned where it was not briefed and argued in district court in party's response to motion for summary judgment or in party's own motion for summary judgment). *See also Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 898 (11th Cir. 1999) (affirming "the unremarkable position that assertions made in the pleadings (*e.g.,* complaint or answer), but not made in opposition to a motion for summary judgment, need not be considered by the district court or the appellate court in ruling on the motion for summary judgment."); *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) ("In opposing a motion for summary judgment, 'a party may not rely on his pleadings to avoid judgment against him. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in

the complaint but not relied upon in summary judgment are deemed abandoned."). Accordingly, and upon consideration of these precedents, the Court finds that Plaintiff has abandoned her non-termination retaliation claims due to her failure to address Defendant's arguments respecting these claims or otherwise provide support for them in her response to the motion for summary judgment.[11]

### 2.    Plaintiff's claim of retaliatory termination.

The Court now turns to Plaintiff's claim of retaliatory termination.  As with discrimination claims predicated on Title VII and § 1981, the elements required to establish a retaliation claim under both Title VII and § 1981 are the same.  *Goldsmith v. Bagby Elevator Co., Inc.,* 513 F.3d 1261, 1277 (11th Cir. 2008).  "To make a *prima facie* showing of retaliation, the plaintiff must show: (1) that  she engaged in statutorily protected conduct; (2) that she suffered adverse employment action; and (3) that there is 'some causal relation' between the two events."  *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010) (quoting *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008)).

---

[11]    The Court here notes that, in the narrative section of her response labeled "Contested Facts," Plaintiff does recount many of the factual circumstances and developments which appear to represent the many non-termination acts of retaliation alleged in the Amended Complaint.  *See* Pl.'s Resp. (Doc. #34) at 11 (regarding change in FLSA status); *id.* at 14 (regarding alleged "threats" to terminate Plaintiff); *id.* at 17 (regarding "unwarranted audit" and revocation of Plaintiff's trainer designation); and *id.* at 18-22 (regarding reprimands given Plaintiff).  However, the Court cannot turn a blind eye to this Circuit's precedent and Plaintiff's complete failure to address Defendant's assertions regarding the many perceived infirmities with these claims.  Merely providing a narrative statement which encompasses some of the factual allegations of the complaint, under the rubric "Contested Facts," does not suffice as a defense to a motion for summary judgment or cure Plaintiff's effective abandonment of such claims.

Plaintiff predicates her retaliatory discharge claim on her filing of an EEOC charge in December, 2007, and her termination in May of 2008. *See* Pl.'s Resp. (Doc. #34) at 37. Defendant does not dispute that these events satisfy the first two prongs of the *prima facie* inquiry as statutorily protected activity and adverse employment action. However, Defendant does challenge whether Plaintiff has satisfied the third prong of the inquiry requiring Plaintiff to show a causal connection between her protected activity and the decision to terminate her employment. "With respect to the third element, a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. However, to satisfy the causal link prong, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action." *Sridej v. Brown*, 361 F. App'x 31, 35 (11th Cir. 2010) (internal quotations and citations omitted). Defendant claims that there is insufficient temporal proximity between the EEOC charge and the decision to terminate to satisfy the causation inquiry and that, moreover, the intervening circumstance of Plaintiff's conduct with Niaquitta Williams breaks any chain of causation.

Defendant first contends that the amount of time between Plaintiff's protected activity and Defendant's adverse employment action defeats any assertion of a causal connection. More than four months passed between Defendant's receipt of notice of the charge and the decision to terminate. Indeed, the Eleventh Circuit Court of Appeals has held that, "in the absence of any other evidence of causation, a three and one-half month proximity between

a protected activity and an adverse employment action in insufficient to create a jury issue on causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006).  Plaintiff's response to this hurdle is two-pronged.  On the one hand she asserts that Steffen was the relevant decision maker, and that his testimony that he learned of Plaintiff's EEOC charge in late April demonstrates any requisite temporal proximity.  In the alternative, Plaintiff asserts that, even crediting Paris and/or Cook as the pertinent decision makers, the evidence she has provided demonstrating the "deterioration" of her workplace environment beginning in January, 2008, and continuing through the date of her termination provides "other evidence of causation" sufficient to satisfy the causal relation prong.

The Court finds that, to the extent the decision to terminate must be attributed to anyone in resolving the causation inquiry, while it is clear that Steffen did suggest that Plaintiff be terminated, the ultimate decision to terminate clearly came from Paris and Cook and was preceded by investigation independent of Steffen's recommendation.  *See Declaration of Paris*, Ex. 4 to Def.'s Mot. For Summary Judgment (Doc. #33) at ¶¶ 17-19; *Declaration of Cook*, Ex. 3 to Def.'s Mot. For Summary Judgment (Doc. #33) at ¶¶ 18-19. Because the true decision makers in this case acted independently of any purportedly "biased recommendation" on the part of Steffen, Plaintiff's termination does not fit within the "cat's paw theory" of causation, which requires that "the plaintiff shows the decisionmaker followed an illegally-biased recommendation without independently investigating the reasoning behind it." *Hanford v. Geo Group, Inc.*, 345 F. App'x 399, 406 (11th Cir. 2009).

Accordingly, in judging the temporal proximity of Defendant's knowledge of Plaintiff's protected activity and the decision to terminate her employment, the Court considers January, 2008, the pertinent date for attributing knowledge to Defendant.

Given the more than four month gap between Defendant's awareness of Plaintiff's protected activity and her termination, Plaintiff must present "other evidence of causation" in order to "create a jury question on causation." *Drago*, 453 F.3d at 1308. The Eleventh Circuit has recently remarked that, "[i]n the absence of close temporal proximity between the protected activity and the employer's adverse action, a plaintiff may be able to establish causation where intervening retaliatory acts commenced shortly after the plaintiff engaged in a protected activity." *Boyland v. Corrections Corp. of America*, 2010 WL 3064420 at *2 (11th Cir. Aug. 6, 2010). Plaintiff contends that the "deterioration of [her] work environment beginning immediately after she filed her EEOC charge (the untimely audit, the removal of her trainer designation, the three May 1, 2008 PCRs, etc.)" suffice as evidence of such causation. Pl.'s Resp. (Doc. #34) at 40. Plaintiff contends that the Court should "infer that each of these matters props up the temporal proximity of the mere four months between notice of [Plaintiff's] EEOC charge and termination." *Id.* Defendant, on the other hand, asserts that "any alleged continuing actions do not negate the lack of causation between when Plaintiff filed her EEOC Charge and when [Defendant] ended her employment." Def.'s Reply (Doc. #35) at 20.

Plaintiff's reliance on the several alleged acts of non-termination retaliatory conduct

by Defendant in order to "prop up" her claim that her termination is causally connected to her EEOC charge is problematic.  For purposes of a Title VII retaliation claim, an actionable "adverse employment action" includes not just "an ultimate employment decision or substantial employment action," but also one "which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related . . . [and] 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).[12]  However, as discussed above, Plaintiff has failed to rebut Defendant's contention that each action about which she complains is either not cognizable as a materially adverse employment action or was based on legitimate reasons related to Plaintiff's conduct and performance, and not pretext for retaliation.  In the absence of affirmative argument by Plaintiff, and based on the record before the Court, the Court finds that the purported "intervening retaliatory acts" do not provide the requisite inference of causation.

Plaintiff claims that the March 26-27, 2008, audit was "untimely" and "unwarranted." At the outset, the Court struggles to comprehend how the mere fact of carrying out an audit of Plaintiff's store to ensure her compliance with company procedures and standards, even

---

[12]     While "[t]he materiality of the alleged adverse action is judged by an objective standard," *Foshee v. Ascension Health-IS, Inc.*, 2010 WL 2511384 at *2 (11th Cir. 2010), the Eleventh Circuit has remarked that Supreme Court precedent "strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to [her] and thus constitute adverse employment actions." *Crawford*, 529 F.3d at 973 n.13.

if one assumes it to be "untimely," qualifies as a materially adverse employment action.  In any event, Plaintiff has offered no evidence to rebut Defendant's assertion that the audit was carried out in full compliance with Defendant's normal practice for newly aligned stores or that other stores were similarly audited out-of-time due to this policy.[13]  Plaintiff also has not rebutted Defendant's contention that the decision to audit Plaintiff's store did not come from Steffen, Paris, Cook, or anyone else involved in the decision to terminate Plaintiff's employment.  Nor has Plaintiff rebutted Defendant's assertion that the auditor and her supervisor were not even aware that Plaintiff had engaged in protected activity at the time of the audit.  Accordingly, the audit simply does not suffice as an "intervening retaliatory act" for purposes of showing causation.

Likewise, the Court finds that the removal of Plaintiff's trainer designation does not suffice as an intervening retaliatory act for purposes of establishing causation.  First, Plaintiff has not challenged Defendant's assertion that the suspension of her training authority did not result in a loss of income to Plaintiff because Defendant did not hire any new employees between the time her certification was suspended and her termination.  *See* Def.'s Mot. (Doc. #33) at 12.  Second, and more fundamentally, even assuming the suspension was materially

---

[13]     *See Declaration of Clark*, Ex. 6 to Def.'s Mot. For Summary Judgment (Doc. #33) at ¶ 4 ("Because those stores [Eufala and Phenix City] had changed auditors, Ms. Freed directed me to conduct audits immediately upon my assuming responsibility for the stores and not in accordance with the Company's usual audit schedule . . . .  This directive was consistent with Ms. Freed's practice that had been in place at least since I became an auditor in 2004 and has been consistently applied since March 2008.  In other words, when an auditor is assigned to a new store, that auditor is supposed to conduct an immediate audit without regard to the store's prior audit score and the Company's usual audit schedule.").

adverse, Plaintiff has not rebutted Defendant's assertion that the decision to suspend Plaintiff's trainer certification was reasonable and justified, given her failed audit and other circumstances, and not pretext for retaliation.  "If the employer offers legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is pretext for retaliation." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).  To show such pretext, "[t]he plaintiff must meet the reason proffered head on and rebut it." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).  "In order to do so, [Plaintiff] must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004)).  It is clear that Defendant's decision to discontinue allowing Plaintiff to train new hires was based at least as much on Plaintiff's failed audit score as her strained interactions with others. *See Memorandum from Paris to Crayton*, Ex. 7 to Pl.'s Resp. (Doc. #34) at 2 ("The potential to regain this position does exist and will be considered but is entirely dependent on your actions, performance, ability and willingness to address and correct everything I have laid out in this summary as well as achieving and maintaining acceptable audit scores."); *Letter from Cook to Crayton*, Ex. 26 to Pl.'s Resp. (Doc. #34) at 1 ("We must ensure you have a clear understanding of the regulations and expectations in the following areas where audit points were low.  At this time, we will refrain

from sending new hires to your store for training."). While Plaintiff has expended much effort disputing Defendant's contention that her workplace demeanor was unprofessional at times, Plaintiff does not assert that she did not actually fail the audit or that Defendant's review of her internal challenge of the audit was incorrect or unfair. Plaintiff also does not suggest that it would be unreasonable for Defendant to suspend the training certification of any trainer whose store failed an audit. Thus, Plaintiff has failed to show that Defendant's decision to suspend her training certification was pretext for retaliation.

Plaintiff also claims that the three PCRs she was given as reprimands in May, 2008, "prop up" her claim that her EEOC challenge is causally linked to her termination. Plaintiff was reprimanded for repeatedly violating company policy by complaining about operational matters directly to upper-level management, for her failed audit, and for refunding certain fees without approval from her supervisor. In each instance, the PCR simply alerted Plaintiff to specific instances of her conduct which Defendant deemed unacceptable and provided her with clear instructions going forward. *See* PCR I, Ex. 36 to Pl.'s Resp. (Doc. #34) at 4 ("Immediately, Twanna is to follow the policy and procedures as outlined in the Operations Associate Handbook for resolving differences and misunderstandings when she disagrees with her manager, Jack Steffen. She is then to take the issue to her RDO, Joe Paris, then EVP, Drew Haney, then President, Bob Manning."); PCR II, Ex. 38 at 3 ("Read e-manual, achieve passing score on follow up and all subsequent audits."); PCR III, Ex. 39 at 3("Twanna must have written approval from her DSM, Jack Steffen, before waiving fees for

27

a customer.").  Plaintiff does not specify how any of these reprimands would be viewed by a reasonable person as having a "materially adverse effect" on Plaintiff or otherwise dissuade a reasonable employee from complaining of discrimination.  Absent such evidence, or any other tangible evidence of consequences for her employment caused by the reprimands, the PCRs do not constitute materially adverse employment actions for purposes of establishing causation.  Moreover, even assuming that the PCRs did somehow constitute materially adverse actions, Plaintiff has not sufficiently rebutted Defendant's assertion that each of the PCRs was issued because of Plaintiff's various violations of policy and/or to correct future behavior, rather than as pretext for retaliation.[14]  Accordingly, the three PCRs do not support a finding of causation between Plaintiff's EEOC charge and her termination.

The numerous other actions identified by Plaintiff in her complaint as retaliatory, but not otherwise discussed in her response to the Motion for Summary Judgment or explicitly referenced in her contention that certain acts "prop[] up the temporal proximity of" her EEOC charge and termination, are similarly insufficient for the purpose asserted.[15]  Plaintiff

---

[14]    In her narrative statement of "Contested Facts," Plaintiff continues to quibble with the justification supporting each PCR.  *See* Pl.'s Resp. (Doc. #34) at 18-20.  However, Plaintiff has not provided any evidence that she did not repeatedly report operational concerns outside her chain of command, that she did not fail her audit, and that she did have permission from her supervisor to refund the fees at issue in PCR III.  Moreover, Plaintiff has not provided any evidence that the PCRs had any effect other than to instruct her on how to handle such matters in the future.

[15]    Upon the Court's review, these acts appear to include: failing to timely respond, or not responding altogether, to Plaintiff's "requests for assistance regarding matters requiring immediate attention at her location;" "increased surveillance of [Plaintiff] at her store;" failing "to timely conduct [Plaintiff's] performance review thereby delaying deserved pay increase;" forcing Plaintiff "to work every weekend until further notice;" ordering Plaintiff "to provide the

does not endeavor to explain how each of these acts would be viewed by a reasonable person as having a materially adverse effect and why Defendant's explanation for each is mere pretext for retaliation.[16]  Suffice it to say that the acts which Plaintiff alleged in the First Amended Complaint do not qualify, in isolation or aggregated, as "intervening retaliatory acts" for purposes of "prop[ping] up the temporal proximity" or otherwise establishing causation.

Given all of the above, the Court finds that, because of the lack of temporal proximity between Plaintiff's protected activity and her termination, and because of the absence of other evidence of causation, Plaintiff has failed to present a jury question on the issue of causation and has therefore failed to state a *prima facie* claim of retaliatory termination. Accordingly, Defendant is entitled to summary judgment as to Plaintiff's claim that she was retaliated against in violation of Title VII and 42 U.S.C. § 1981.

## C.    Plaintiff's Fair Labor Standards Act Claim.

In Count Four of her amended complaint, Plaintiff claims that "Defendant willfully

---

District Manager with a weekly roster of her schedule;" and "repeatedly threaten[ing] to terminate" Plaintiff's employment.  First Amended Complaint (Doc. #26) at ¶ 25.

[16]    Plaintiff does not describe most of the actions in precise detail so that the Court may subject them to the requisite analysis.  The Court is left to speculate about the particulars of Plaintiff's unanswered "requests for assistance" and "increased surveillance."  Moreover, several of these acts appear attributable to Steffen who, as Plaintiff has asserted, was not even aware of Plaintiff's EEOC charge at the time he failed "to timely conduct [Plaintiff's] performance review," required her "to work every weekend," and "provide the District Manager with a weekly roster of her schedule."  Of course, Plaintiff also has not rebutted Defendant's assertions that these actions by Steffen applied to all Store Managers within his district and thus cannot be retaliatory as to Plaintiff.

and wrongfully misclassified [her] as an employee exempt from the provision of the FLSA,"

that Defendant "willfully violated the provisions of the FLSA by failing to compensate [her]

with overtime pay for work weeks in which she worked more than forty hours," and that

"Defendant failed to maintain accurate records as required by the FLSA with respect to

[Plaintiff], including records sufficient to accurately determine [Plaintiff's] wages and hours

of employment."  First Amended Complaint (Doc. #26) at ¶¶ 42-44.[17]  Plaintiff's response

to the motion for summary judgment clarifies that she "asserts that she was wrongfully

classified as exempt from her hire until January 30. 2008."  Pl.'s Resp. (Doc. #34) at 43-44.

Defendant argues that it is entitled to summary judgment as to this claim because Plaintiff

was properly classified during that time as an exempt employee for purposes of the FLSA's

overtime requirement.  Def.'s Brief (Doc. #33-1) at 15.  Specifically, Defendant asserts that

Plaintiff was properly classified as exempt under three different exemptions recognized

under the FLSA - the executive, the administrative, and the combination.  Plaintiff denies

that any of the exemptions are applicable to her.

The Eleventh Circuit has recently addressed the purpose and scope of the FLSA and

its exemptions:

> The FLSA was enacted in 1938 to aid the unprotected, unorganized,
> and lowest paid of the nation's working population; that is, those employees
> who lacked sufficient bargaining power to secure for themselves a minimum
> subsistence wage.  To further goals of protecting employees from abusive
> labor practices, Congress set federal standards regarding minimum wages and

---

[17]     Plaintiff did not present this claim in her original complaint filed on July 31, 2009.  The First Amended Complaint was filed on November 19, 2009.

child labor, and established a forty-hour workweek.

> There are provisions for a workweek beyond the forty hours set by the statute.  If an employee works more than forty hours in a week, the employee must be compensated at least time-and-a-half for each hour over forty. However, if the employee works in a bona fide executive, administrative, or professional capacity, then the overtime pay requirements do not apply. . . .

> The employer bears the burden of proving that an employee is exempt from overtime payments.  FLSA provisions are to be interpreted liberally in the employee's favor and its exemptions construed narrowly against the employer.

*Rock v. Ray Anthony Intern., LLC,* 2010 WL 2089636 at *1-*2 (11th Cir. May 26, 2010) (internal quotations and citations omitted).  Against this backdrop, the Court will consider whether there is a genuine issue of material fact respecting whether any of the exemptions asserted by Defendant are applicable.

### 1.        The Administrative Exemption.

In relevant part, the Code of Federal Regulations establishes a three-part test to determine whether an employee fits within the administrative exemption:

> 1) the employee must be compensated "on a salary basis at a rate of not less than $455 per week";
> 2) the employee's "primary duty is the performance of office of non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and
> 3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."

29 C.F.R. § 541.200; *see also Rock*, 2010 WL 2089636 at *2.    Plaintiff concedes that Defendant can establish the first and second prongs of the administrative exemption, but contends that there is a genuine issue of fact with respect to the applicability of the third

prong, *i.e.,* whether her "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance."  Pl.'s Resp. (Doc. #34) at 48.  According to the Eleventh Circuit, with respect to the third prong,

> Courts must determine whether the employee's job involves the comparison and evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.  The ultimate question is whether the employee has the ability to make an independent choice, free from immediate direction or supervision.  Although there is no requirement that the employee operate free from oversight, the employee's duties must involve more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals and other sources.

*Rock*, 2010 WL 2089636 at *3 (internal citations and quotations omitted).

The Court has previously listed the particular management-related duties germane to Plaintiff's position which are set out in her job description.[18]  Defendant further describes the duties and expectations of its Store Managers as follows:

> "Store Managers . . . manage the day-to-day operations of each store, particularly to supervise the sales associates assigned to each store.  Indeed, managing each store and supervising the full-time sales associates is the primary responsibility of a Store Manager . . . .  Store Managers also make cash deposits for each of their stores.  They also apportion the work between their direct reports.  Store Managers also plan and ensure compliance with the

---

[18]    According to the job description, these included: "Coordinates allocation and use of company resources to ensure efficient stable sales growth and collections;" "Works with Corporate Marketing Group to develop and execute local marketing plans and strategies including marketing schedules, coverage maps, and customer appreciation programs;" "Coordinates personnel activities of staff (i.e., personnel scheduling, trains, appraises, rewards, motivates, disciplines, and recommends terminations as appropriate);" "Recommends candidates for interview and selection;" "Prepares store reports and documents in accordance with established company policies and procedures;" "Maintains sales and operating records, and files in accordance with established company policies and procedures including Federal and State regulatory compliance." *Job Description*, Ex. 5 to Pl.'s Resp. (Doc. #34).

budget for their respective stores.

> Store Managers oversee the operations of their assigned branch. Their duties include, but are not limited to: recruiting new sales associates; interviewing and hiring sales associates candidates[19]; disciplining sales associates; recommending termination of any associates under their supervision if necessary; and reviewing sales associates' weekly audits of held checks and other transactions to ensure compliance with Company procedures. The audits were important because of applicable government regulations that apply to financial institutions like Valued Services. If Valued Services is in violation of those regulations, it could be subject to stiff fines or other punishment. . . . [Plaintiff was also asked] to complete Daily/Weekly Goal Sheets, which sets out the weekly sales and collections goals for the stores and details the marketing activities each Store Manager planned for the week. Although the Company typically sets some monthly targets, the Store Managers have discretion to set their own sales and collections goals for each week, without [the] input or approval [of her District Manager].

*Declaration of Steffen*, Ex. 6 to Def.'s Mot. (Doc. #33) at ¶¶ 4-5. Defendant also claims that

Plaintiff "often disciplined the sales associates who reported to her;" "executed agreements

with employees on behalf of the Company;" and further asserts that Store Mangers

> supervise their sales associates by giving them daily/weekly/monthly tasks, setting a work schedule, giving them goals, following up behind them to ensure compliance, resolving any internal conflicts or issues, providing guidance and feedback, and continuously training. Store Managers review their budget and maintain cost within budget limits (payroll dollars, utilities, supplies, etc.). They make decisions regarding how and when best to market the business locally via sending out mailers, calling inactive customers, visiting business partners, dropping fliers, and other activities they deem effective.

*Id.* at ¶¶ 8, 9, & 10. Based upon her discharge of these myriad duties and expectations,

---

[19]     Of course, Plaintiff's authority to hire associates was not absolute. However, her recommendations as to hiring were considered and ordinarily given deference during the decision making process. *See Declaration of Steffen*, Ex. 6 to Def.'s Mot. (Doc. #33) at ¶ 6.

Defendant contends that Plaintiff satisfies the administrative exemption because

> Plaintiff performed the following tasks that demonstrate that her duties 'included' the exercise of discretion: (1) she performed work that substantially affected business operations to a significant degree; (2) she had authority to commit Valued Services in matters that had substantial impact, including marketing plans and agreements with sales associates; (3) she audited the work of sales associates; (4) she was involved in planning and setting long or short-term goals for her store; (5) she was responsible for ensuring compliance with regulatory requirements; and (6) she completed critical reports directly related to the management of her store.

Def.'s Memorandum of Law (Doc. #33-1) at 20.

In the face of these many recitations of the duties and expectations related to Plaintiff's position and Defendant's assertion that Plaintiff fits squarely within the administrative exception, Plaintiff's response is tepid by comparison. Plaintiff's contention that her "primary duty" did not include "the exercise of discretion and independent judgment with respect to matters of significance" is predicated entirely on a brief excerpt of Paris's memorandum to Plaintiff at the time she was given the three PCRs in May, 2008, in which Paris admonished Plaintiff that "It must be made clear that while you are a 'Manager' of a store, you do not possess the right or the authority to interpret any company policies or procedures." *See Memo from Paris to Crayton*, Ex. 7 to Pl.'s Resp. (Doc. #34) at 1. For Plaintiff, these words "clearly demonstrate how Valued Services viewed [Plaintiff's] exercise of discretion and independent judgment." Pl.'s Resp. (Doc. #34) at 48.

As Plaintiff has predicated the entirety of her argument regarding the applicability of the administrative exemption on this excerpt from Paris's memorandum, the Court deems it

34

prudent to frame those words in the context which their author intended before subjecting them to analysis.  In the Memorandum, Paris is generally counseling Plaintiff about what he perceives as a pattern whereby "every time anyone addresses a concern about anything with you[,] instead of listening, taking responsibility[,] and correcting the issue(s)[,] you choose to purposefully undermine those that are responsible for addressing any and all issues regarding the operation, management[,] and performance of you and your store." *Memorandum from Paris to Crayton*, Ex. 7 to Pl.'s Resp. (Doc. #34) at 1.  Paris cites as "clear examples" of such conduct "the numerous faxes" concerning operational matters which Plaintiff sent to both Human Resources and upper management and which have been discussed previously.   Paris goes on to advise Plaintiff that, after investigating such complaints, the

> complaints have been determined to have no merit but are rather based on your "opinion" and or lack of knowledge rather than fact. . . .
>
> The reality is most of these issues are the result of your flawed interpretation of company policy and procedure.  It must be made clear that while you are a "Manager" of a store, you do not possess the right or the authority to interpret any company policies or procedures.  That is what your supervisors are for. If you are unsure it is your responsibility to ask for clarification, not argue who is right or wrong.
>
> However, as a "Manager" entrusted with managing a store you do have an obligation and responsibility to know, understand and execute the company's policies and procedures.

*Id.*

When read in its full context, it is clear that Paris is attempting to curtail Plaintiff's

habit of challenging what might be perceived by others as her failings or shortcomings by bombarding Human Resources and/or upper management with unsolicited explications of her conduct and justifications hinged on her own flawed interpretations of policy.  Plaintiff's fax of her voluminous audit challenge, which, upon review, was determined to be mostly without merit, exemplifies such conduct.  Of course, Paris does not suggest that Plaintiff may not exercise "discretion and independent judgment with respect to matters of significance" so long as that exercise of discretion is consonant with "the company's policies and procedures."  In other words, Paris does not suggest, and Plaintiff does not contend, that Plaintiff is unable to exercise discretion where policy provides for a "Manager" to exercise such discretion.  Accordingly, while Paris's words, at first blush and in isolation, may appear damning, when placed in their appropriate context they are only superficially so. Hence, Plaintiff's reliance on this statement alone is unavailing; the analysis must go deeper.[20]

Apart from her reliance on the Paris memorandum, Plaintiff's assertions relevant to this issue are mostly vague and conclusory.  For example, she claims in her affidavit that

> [t]he bulk of my job was spent performing the same duties as my associates. The store would be so busy that I would have to participate in the same customer service type duties that they did for the most part.  My managerial duties of running reports, etc., were not very time-consuming as they were largely automated.  On the other hand, any duty related to customer service, whether collecting payments, writing loans or engaging in collection activities, was extremely time-consuming given the nature of our interaction.  I estimate that well over 70% of my time was spent involved in non-managerial duties.

---

[20]     It is also noteworthy that Paris's admonition to Plaintiff about her inability to "interpret" policy came after Plaintiff was reclassified as non-exempt for purposes of the FLSA.

36

*Affidavit of Crayton*, Ex. 1 to Pl.'s Resp. (Doc. #34) at ¶¶ 17-19.  While Plaintiff generally, and understandably, seeks to minimize the scope and importance of her management-related duties,[21] in her deposition she admitted that she participated in "numerous" interviews with associates (*Deposition of Crayton*, Ex. 3 to Pl.'s Resp. (Doc. #34) at 64), recruited potential employees (*id.* at 80), trained as many as "ten or eleven" employees (*id.* at 83), that she conducted such training largely free from oversight by her supervisors (*id.* at 92), that she disciplined "numerous employees" (*id.* at 100), devised marketing plans and oversaw her associates' creation of such plans (*id.* at 104-05), and that she generally managed the day-to-day operations of her store, including making schedules and observing and providing guidance to her associates in the discharge of their duties (*id.* at 169).  Nowhere does Plaintiff expressly deny that her duties included the numerous duties asserted by Defendants which are set forth above; nor does she assert, apart from her discussion of the Paris memorandum, that discharging such duties did not require "the exercise of discretion and independent judgment with respect to matters of significance."  Indeed, other courts have routinely recognized that employees vested with essentially the same duties as Plaintiff do "exercise . . . discretion and independent judgment with respect to matters of significance." *See, e.g., Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 332 (5th Cir. 2000) (affirming grant of summary judgment and holding that "supervisory duties" including "coordination of the work of the other employees within the office, the discipline of

---

[21]    *See* Pl.'s Resp. (Doc. #34) at 5-6 (discussing Plaintiff's belief that she and her subordinate sales associates generally performed the same tasks on a daily basis).

employees, evaluation of employees' job performance, . . . making recommendations . . . regarding the hiring of new employees and discharge of present employees, as well as supervising the orientation and training of new office employees" "require the exercise of discretion and independent judgment"); *Saxton v. Young*, 479 F. Supp2d 1243, 1252 (N.D. Ala. March 14, 2007); *Bosch v. Title Max, Inc.,* 2005 WL 357411 (N.D. Ala. Feb. 7, 2005).

The Court finds its sister court's decision in *Bosch* particularly instructive.  In *Bosch*, the Court in the Northern District of Alabama determined that a "store manager" of a Title Max[22] store qualified as exempt pursuant to the administrative exemption.  *Id.* at *9.  The operational structure Title Max employed is very similar to that utilized by Defendant, consisting of stores with managers, then district managers, regional managers, and so forth. *Id.* at 1.  Store Managers have essentially no role in crafting company policy or business direction.  The Court observed that, while the plaintiff in that case "had two assistant managers under her," some "evidence indicates that the actual duties of managers and assistant managers were not all that different.  The primary differences were in dealing with the main office, and in terms of planning what the other employees would do."  *Id.* Moreover, the plaintiff "did not directly hire or fire employees[,]" but rather "interviewed prospective employees, and made recommendations" as to their hiring.  *Id.* at 2.  Likewise, the plaintiff made "recommendations as to whether to fire" "assistant managers or any other employee," and referred disciplinary matters to the district manager.  *Id.*  Furthermore, the

---

[22]      According to the Court, Title Max's "sole business is to lend money against a persons's automobile title."  *Id.* at *1.

plaintiff "was the primary trainer of new assistant managers[,]" which she did, for the most part, without the direct supervision of her supervisors.  *Id.*  Against this relevant factual backdrop, the Court determined that the plaintiff's duties "required her to exercise discretion and independent judgment" because, *inter alia*, she "was fully responsible for the day to day operations of the store[,] "scheduled her assistants' work," "made recommendations about the hiring, firing[,] and discipline of assistant managers[,]" "interviewed applicants and presented a recommendation to her district manager based on her evaluation of the interviewees[,]" and decided "whether or not to report assistant managers to the district manager for discipline."  *Id.* at *8-*9.  Ultimately, the Court held, while the plaintiff was given "much direction" from her supervisors, she

> was the highest ranking employee at her location.  The only logical conclusion is that [the plaintiff] regularly exercised discretion and independent judgment in her job.  While the scope of her discretion was not "limitless," [she] regularly considered possible options, evaluated them, and chose among courses of action.  It is virtually impossible to conceive of a free standing business location without a "manager."  Title Max, [sic] could not, and did not, rule by remote control.

*Id.* at *9.

Likewise, it is apparent to this Court that Plaintiff's admitted duties required her repeatedly to exercise "discretion and independent judgment" in executing her duties. Plaintiff exercised discretion and independent judgment in deciding whether and how to recruit potential hires, whether to recommend interviewees for hiring, and whether and how to discipline her subordinates or refer them for discipline to her supervisors.  Plaintiff also

39

was, for the most part, the highest ranking employee at her store on a day-to-day basis.  As such, she exercised discretion and independent judgment in delegating work, directing her subordinates in their duties, scheduling their hours, and overseeing the business operations of the store.  Plaintiff also conducted training of both associates and managers relatively free of oversight by her supervisors.  Plaintiff does not, and can not plausibly, contend that these tasks are not matters of significance for Defendant's company.  Accordingly, the Court finds that Plaintiff fits within the administrative exemption to the FLSA and that, therefore, Defendant is entitled to summary judgment as to Plaintiff's claim that Defendant violated the FLSA by failing to compensate her for overtime.[23]

### D.    Plaintiff's Fair Labor Standards Act Retaliation Claim.

Count Five of Plaintiff's First Amended Complaint alleges that Defendant retaliated against her by terminating her employment after she "complained to her supervisors that she was misclassified and was not receiving overtime compensation."  First Amended Complaint (Doc. #26) at ¶¶ 47-48.  In response to this claim, Defendant first asserted, *inter alia*, that there was no evidence that the relevant decision maker(s) who determined to terminate Plaintiff's employment had any knowledge of Plaintiff's June or July of 2007 complaint to Gordy and Jowers about her classification and pay.[24]  *See* Def.'s Memorandum (Doc. #33-1)

---

[23]    Because the Court finds that Plaintiff was properly classified as exempt under the administrative exemption, the Court need not address Defendant's arguments about the applicability of the executive or combination exemptions.

[24]    Paris and Steffen assumed their roles as Plaintiff's RDO and DSM, respectively, in November of 2007.

at 23.  Apparently recognizing the significance of this evidentiary void, in her response to the motion Plaintiff recasts her FLSA claim, contending that she was terminated because of "her EEOC charge regarding her failure to be made hourly and paid overtime."  Thus, Plaintiff now contends, her FLSA retaliation claim mirrors her Title VII retaliation claim.[25]

Accepting Plaintiff's present characterization of this claim, the Court need only refer back to its discussion of Plaintiff's Title VII retaliation claim and conclude that, for the reasons already given, Plaintiff has failed to state a *prima facie* case of retaliation related to her EEOC charge because of the lack of temporal proximity between the charge and her termination, and the absence of other evidence that her termination was the result of her EEOC charge.  Accordingly, Defendant is entitled to summary judgment of Plaintiff's FLSA retaliation claim.

## V.    CONCLUSION

For the reasons specified above, it is

ORDERED  that  Defendant's  Motion  for  Summary  Judgment  (Doc.  #33)  is GRANTED.   Plaintiff's First Amended Complaint is DISMISSED  with prejudice.   A separate judgment will issue.

---

[25]    Plaintiff has explicitly "adopt[ed] and incorporate[d] her discussion regarding Title VII" in the context of her FLSA retaliation claim.  Pl.'s Resp. (Doc. #34) at 49.

41

DONE this 2nd day of September, 2010.


/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE